FILED
10/25/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 8, 2017 Session

# IN RE ERIC G.[1]

**Appeal from the Juvenile Court for Sevier County**
No. 16-001096      Dwight E. Stokes, Judge

_____

## No. E2017-00188-COA-R3-PT

_____

In this termination of parental rights case, a mother appeals the termination of her rights to her son on the grounds of abandonment by failure to establish a suitable home, persistence of conditions, and mental incompetence and upon the finding that termination was in the child's best interest. Upon our review, we discern no error and affirm the judgment of the juvenile court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Judith A. G.

Herbert H. Slatery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I. FACTUAL AND PROCEDURAL HISTORY

Eric G. was born in June 2001 to Judith G. ("Mother") and Richard G. ("Father"). On January 23, 2014, the Department of Children's Services ("DCS") initiated a proceeding in the Sevier County Juvenile Court to have Eric declared dependent and neglected because he had not been enrolled in school since 2009, he was "severely autistic and non-verbal," and it would be in his best interest "to remain in the home of his

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

mother subject to protective supervision by this Court and in compliance with the counseling, treatment, and other conditions and limitations . . . ." The petition requested that the court, *inter alia*, find Eric to be dependent and neglected and order Mother to: immediately enroll Eric in school; allow DCS access to her home and comply with in-home services; and complete a mental health evaluation and follow any recommendations. That same day Mother was ordered to allow DCS representatives access to inspect her home and to "immediately enroll [Eric] in school."

On February 4, 2014, the guardian *ad litem* filed an emergency motion to place Eric in state custody, alleging that Mother's mental health issues and stated unwillingness to comply with DCS requests "place[d] the child at great risk" and that Eric was "educationally neglected" and "medically neglected in the mother's care." The court held a hearing on February 5 on the petition that DCS had filed on January 23 and held that DCS established probable cause that Eric's removal from the home was required; the court entered an emergency custody order, placing Eric in the temporary legal and physical custody of DCS and granting Mother and Father visitation. Thereafter, DCS placed the child at Norris Academy.[2] Further hearings were held on March 5 and May 1, after which the court adjudicated Eric to be dependent and neglected due to Mother's failure to comply with school attendance laws and to provide Eric with recommended speech, occupational and physical therapy.

On October 2, 2015, pursuant to an emergency motion filed by the guardian *ad litem* reporting that Mother's visitation privileges had been permanently revoked at the Academy, the court suspended Mother's visitation at Norris Academy. The court permitted DCS to "facilitate the Mother's visitation with the child under strictly supervised conditions within the Sevier County Department of Children's Services offices." The order also permitted the guardian *ad litem* to temporarily suspend further contact between Mother and Eric if inappropriate behavior was observed by or reported to him. On October 15 the guardian *ad litem* filed a notice of suspension of Mother's visitation based on a DCS psychologist's opinion that it was in Eric's best interest to suspend visitation for his "developmental, emotional, and psychological safety." The court entered a detailed order on November 30, 2015, suspending Mother's visitation.

In the course of the dependent and neglect proceeding, three permanency plans were developed and ratified by the court. The first was developed by the DCS team in February 2014 with the goal of "return to parent." This plan required Mother, among other things, to: complete a mental health assessment and follow the recommendations;

---

[2] A description of Norris Academy is not provided in the record, although employees of the institution testified at trial and the final order noted that Eric received "medical and therapeutic assistance, educational assistance at Norris Academy." According to its website, Norris Academy is "a residential treatment facility for children and youth ages 5 to 21 diagnosed with Autism Spectrum Disorder" located in Norris, Tennessee. *Norris Academy*, SEQUEL YOUTH AND FAMILY SERVICES, http://www.sequelyouthservices.com/html/autism-norris.html (last visited October 10, 2017).

complete a parenting assessment; and participate in family therapy to learn appropriate skills needed to meet Eric's special needs and demonstrate them on a consistent basis. Mother and her attorney were present in the meeting at which the plan was developed and, on the page entitled "Agreements," Mother acknowledged that the plan had been discussed with her. She checked the box indicating that she did not agree with the plan and included the handwritten notation that "I disagree with all the false accusations on the plan against me as parent and me as an individual and a human being. They have also reported that I made statements that I didn't make on these pages." The plan was ratified in May 2014. The second plan was developed in July 2015 with the added goal of adoption. Mother and her counsel were present during the meeting in which the plan was developed, and on the "Agreements" page Mother acknowledged that the plan had been discussed with her. She checked the box indicating she did not agree with the plan; in the box where she was to explain her "no" answer, she wrote "MANY LIES ON THIS." The plan was ratified in October 2015 and required Mother to, among other things, sign a release of information so DCS could obtain a copy of her mental health assessment and resulting recommendations, to apply for Social Security, and to "work with Sevier County Housing Authority to retain her public housing." The third plan was developed in June 2016 with the sole goal of adoption and ratified in August; it retained the responsibilities in the prior plans. Mother is listed in the plan as participating in the team meeting by phone and "not available to sign"; her attorney was present, as was the guardian *ad litem*.

On August 1, 2016, DCS filed a petition to terminate Mother's parental rights on the grounds of mental incompetence, abandonment by failure to provide a suitable home, and persistence of conditions; the petition also alleged that termination was in Eric's best interest.[3]

Trial was held on December 2, 2016; Mother was not present. The day before, Mother had filed a motion to continue the trial, asserting that her physical and emotional health "is not such that she should be required to undergo the rigors of a termination hearing at the present time." Prior to commencing the trial, Mother's counsel argued that a continuance was necessary because "it has been reported by my client to me that my client suffers from the following: . . . pressure thyroid issues, . . . previous heart attacks, elevated pulse, serious and chronic upper and lower gastrointestinal problems, . . . [and] that the most recent fires in Sevier County have caused . . . her breathing issues to be affected." After hearing from counsel for DCS and the guardian *ad litem*, the court denied the motion and proceeded to hear testimony.

---

[3] Father, whom the record shows resided in Ohio, was a party to the dependent and neglect proceeding; the petition for termination advised that he surrendered his parental rights to Eric on July 13, 2016, and as a result was not a party to that proceeding.

3

Cassandra Phillips, a case manager, and Katherine Rudder and Jan Gardner, family services workers, testified on behalf of DCS. Leigh Anne Goldstine, a licensed professional counselor who provided supervision during weekly therapeutic visitation between Mother and Eric at Norris Academy, and Cathie Haviland, a therapist at Norris Academy who provided individual therapy for Eric and family therapy for Eric and Mother, were also called to testify by DCS; Dr. Shannon Wilson, a psychologist who evaluated Mother in May 2015, testified by deposition. Mother presented no proof.

On January 10, 2017, the court entered an order terminating Mother's parental rights on the grounds of abandonment by failure to establish a suitable home, persistence of conditions, and mental incompetence; the court also held that it was in Eric's best interest for Mother's rights to be terminated. Mother appeals, asserting that the grounds for termination and the holding that termination of her rights is in Eric's best interest are not supported by clear and convincing evidence. She also asserts that the court denied her due process of law by failing to grant her motion for a continuance of the trial.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proven by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R.

4

App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. Motion to Continue

Mother argues that the trial court denied her right to due process of law in not granting a continuance of the trial. She concedes that the motion, which was filed the day before trial, did not comply with the local rules of court, because she did not attach a written statement of a physician when seeking a continuance based upon illness.[4] In presenting the motion, her counsel stated that he had requested a medical excuse from the doctor whose name Mother had provided as her primary care physician but that no excuse had been provided.

Mother's counsel argued that the motion should be granted "to allow [Mother] to be treated" for various illnesses, including "pressure thyroid issues, previous heart attacks, an elevated pulse, serious and chronic upper and lower gastrointestinal problems" and "breathing issues" due to "the recent wild fires that occurred in Sevier county." Counsel for DCS opposed the motion, arguing that "this is an ongoing trend where the mother tries to delay Court hearings, . . . requests to reschedule Court hearings, requests to reschedule meetings to the point that even when the Department's worker goes to pick her up at her house, she's not ready and delays, delays, delays"; counsel advised the court that "[w]e actually have a voice mail from [Mother] yesterday which relates some of the same information that her attorney did . . . [and] gives the impression that she has not planned on coming to this f[or] months." In like manner the guardian *ad litem* stated "[t]his is an ongoing issue. Clearly, [Mother] is going to be under stress and anxiety during this. She has been throughout every, every court appearance. . . . However she

---

[4] The rule, 4th District Circuit Court, Civil 4.02, states:

> When the application for the continuance is based upon the illness of a party, or a material witness, there must be filed therewith a written statement of a physician specifying the type of illness, whether same is temporary or permanent, and whether or not such person is able to appear in court. (The court may allow the late filing of the application and affidavit.)

hasn't been able to provide any medical necessity to why she would need to be specifically excused today." The court denied the motion, ruling:

> [I]n regard to her condition, it seems like she's had ongoing issues we've known about for a few years in dealing with this case. It does not appear to be anything that's particularly new or anything that there is a doctor saying that she cannot go forward with the hearing or the trial. There's not any medical documentation at all. Does not appear to be anything that can be expected to change or that could not be raised at any time. In other words, prior heart attacks or prior heart issues with nothing imminent. Nothing specific in the gastrointestinal. Again, nothing appearing imminent or there's no doctor excuse. And all other medical conditions, the same situation. So, I don't see anything that's really going to change with that. This has been a long-standing date. Everybody has been able to plan on it and prepare for it. And there's been a lack of participation by her on some matters here recently, except through her counsel, who has been -- who has done a diligent job in representing her. So, based on those reasons, the Motion for Continuance will be denied.

"The granting or denial of a motion for a continuance lies in the sound discretion of the court." *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997) (citing *Moorehead v. State,* 409 S.W.2d 357, 358 (Tenn. 1966)). The court's ruling on such a motion will not be disturbed on appeal "unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *Blake*, 952 S.W.2d at 415 (citing *State v. Strouth,* 620 S.W.2d 467, 472 (Tenn. 1981), *cert. denied,* 455 U.S. 983, (1982)). In *Tidwell v. Burkes,* this Court set forth the standard to be applied in ruling on a motion to continue:

> When considering a motion for continuance, the following factors are relevant to the trial court's decision: "'(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted.'"

No. M2015-01270-COA-R3-CV, 2016 WL 3771553, at *5 (Tenn. Ct. App. July 8, 2016) (internal citations omitted).

Applying these factors, we observe that the trial date had been set for nearly three months, that Mother failed to document the illnesses identified in her motion or by her counsel and any effect those illnesses may have had on her ability to appear in court, and that she failed to obtain a medical excuse from her doctor which was in compliance with local rule 4.02. She does not assert that any prejudice resulted from the denial of the motion and, from our review of the record, we discern none. Reviewing the trial court's

6

application of the *Tidwell* standard, we conclude that the court did not abuse its discretion in denying the motion.

**B. Grounds for Termination**

**1. Persistence of Conditions**

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tennessee Code Annotated section 36-1-113(g)(3) when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

The petition to terminate Mother's rights alleged that Mother failed to follow an order entered in the dependent and neglect proceeding to enroll Eric in school and that in the 29 months Eric was removed from Mother's home, "Mother has never accepted responsibility for her failure to comply with compulsory attendance laws" and that "Mother has an explicit inability to provide for this child's basic needs [. . .and] is not able to care for him safely." In the order terminating Mother's rights, the trial court held:

> In regards to the allegation of persistent conditions, the Court finds that the State has proven this by clear and convincing proof due to all of the mother's conduct, which indicates total and substantial likelihood that she would not be able to remedy these conditions; that she was given many months of opportunities to indicate some kind of remorse or change or willingness to undergo change and that she never did do anything of that nature except to mouth a few times that she would get the child back in school, which from the history of it, does not amount to anything because she has not done it and had refused to do so. All of this in regards to persistent conditions is established by what the Court has already summarized in regards to the Department employees' testimony, therapists' testimony, medical testimony through deposition, and the history of the

7

case in general, which all demonstrates the mother's lack of remorse and unwillingness to change.

> By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(3) have been met[.]

Mother contends that the holding is not supported by clear and convincing evidence.

Testimony relating to this ground was provided by Ms. Phillips, Ms. Gardner, Ms. Rudder, Ms. Goldstine, Ms. Haviland and Dr. Wilson.

Ms. Phillips testified that she was assigned to this case in November of 2013 when DCS received a referral that Eric's education was being neglected and that he lacked supervision. She made contact with Mother, who "admit[ted] that Eric was not in school" [and. . .] that she had been trying to home school him; Ms. Phillips made a second visit at the end of January of 2014, at which time she determined that Mother had not enrolled Eric in school; she was told by Mother that Eric was "autistic and relied on her for everything" and that she was not enrolling Eric in public school because "[s]he was fearful that somebody would try to hurt him." During the second visit she observed that Eric was unable to use the restroom by himself but could walk, make sounds, and feed himself, and that he walked around naked from the waist down after removing his diaper.

Ms. Gardner, the family service worker who was assigned to the case in February 2014 when Eric was brought into DCS custody, testified that the number one concern when DCS first became involved was getting Mother to enroll Eric in school. Ms. Gardner testified that Mother "told [her] initially when we started this journey together that she wasn't going to cooperate, there was no reason for this child to be in foster care, she was an excellent mother, she knew what she was doing, and she didn't feel like any service provided to her would help her be a better mother than she was." Ms. Gardner testified as to measures she took to assist Mother in performing her responsibilities under the permanency plan including: working with the Sevier County Housing Authority to get Mother's rent reduced; offering to assist Mother in doing medication counts to verify that she was taking prescribed medication and to perform random drug screens; helping Mother in getting groceries; transporting her to and from court; and assisting Mother in finding employment. Ms. Gardner testified that Mother began working with the therapist at Norris Academy as recommended by the parenting assessment, but that the therapy "didn't work well" because Mother "didn't respond to specific guidelines, modeling," but "always reported that this was her child and she knew what was best and she didn't need help doing that." Ms. Gardner testified she was able to get therapeutic services for nearly a year but that funding was stopped due to Mother's lack of progress. Ms. Gardner testified that she had no concerns about Mother physically hurting Eric but did have concerns "about her lack of boundaries with Eric and her treating him as an infant as

8

opposed to an adolescent," specifically that Mother had not recognized that Eric was reaching puberty.

Ms. Rudder, who took over as family service worker in August 2015, testified that she communicates with Mother every week and makes visits to her home once a month; that she arranged for Mother to attend parenting classes and provided transportation; that Mother "said the classes don't teach her anything new and it already confirms everything she already knows about being a parent"; and that Mother told her that she "provided [Eric] with all the education he needed and that . . . she could provide it better and protect him better than anyone else could." When asked if Mother had ever expressed remorse for Eric being removed from the house, Ms. Rudder testified that "[Mother] just states that there was no wrongdoing, she is a perfect mother, she loves Eric, and he should not have been taken from her home."

Ms. Goldstine testified that she supervised weekly therapeutic visitation between Mother and Eric from September 2014 through February 2015 at Norris Academy;[5] that during visitation "Mom was mostly argumentative with me, didn't do well with instruction that was given to her"; that Mother did not seem open to learning during the six-month period she supervised their visits; that Mother is "pretty argumentative" and "pretty strong-willed"; and that she "didn't like people interfering with her interpretation of what or how Eric should be raised or how she should do things with Eric," which "were the things that spurred her anger issues." Ms. Goldstine testified that she stopped providing supervision to the visits in February 2015 because she had "set a limit with [Mother] and she pushed me. She put her hands on me"; she testified that immediately after the incident, she and her supervisor determined that it would be best if the supervisor took over supervising the visits.

Ms. Haviland provided individual therapy services to Eric beginning February 2014 and weekly family therapy sessions to Mother and Eric from late 2014 through the summer of 2015; at the inception of her work, she had four goals for the family therapy sessions: to bring no food; to learn first-then language[6]; to take Eric to the restroom and give verbal prompts only; and to be successful in an outing. She testified to a range of observations and difficulties she encountered in the course of her work. She testified that Mother was "never receptive to much input" or coaching during their family therapy

---

[5] Ms. Goldstine testified that therapeutic visitation entails "the person assisting with the visitation intervene[ing] as necessary to provide guidance or direction to the parent to enable them to better their parenting skills." In this case, the therapeutic visitation consisted of Ms. Goldstine supervising Mother and Eric's time together and, as necessary instructing or guiding Mother.

[6] Ms. Haviland explained that "first-then language" is "applied behavioral analysis, teaching, training" in which individuals on the autism spectrum are taught to do certain things they don't like to do in order to get certain "reinforcers" they do like. She used the chore of dusting with a reward of candy afterward as an example.

9

sessions; that Mother never changed or seemed open to change or express an interest in learning about Eric's sensory diet or therapies; and that when she gave Mother direction during the sessions, Mother "would just go off and sit in a chair. I would have to constantly ask her to engage Eric and be a part of the session. And when she did, she would like force him or do things for him." She observed that Mother created a risk of harm to Eric on one occasion when "[Mother] became very escalated when we're transitioning from the family [therapy] session to the visitation by the Omni person [Ms. Goldstine]," at which point Ms. Haviland "kept asking [Mother] to calm down because Eric was curled up in a ball just rocking" before Ms. Haviland "finally removed him"; the other occasion was when she saw Mother "shove[ing] food down his throat."[7] Ms. Haviland also testified that the family therapy sessions had been stopped a couple of months prior to August 2015 because "none of the goals were met" and "zero was accomplished"; about several inappropriate interactions she witnessed between Mother and Eric and had to redirect; and that after the CEO of Norris Academy intervened in one situation that seemed sexually inappropriate, Mother's visitation at Norris Academy was stopped completely.

Dr. Wilson, who conducted a psychological evaluation of Mother in May 2015, testified that she prepared a report following the evaluation in which she observed:

> [Mother's] behavior has been described by others as being highly unusual, as she is frequently irritable, defensive and verbally aggressive toward others. This behavior was observed during this evaluation, as well, as she was extremely negative in her descriptions of the agencies involved in this case, seemed reluctant to participate in activities related to the evaluation, and spoke repeatedly about how she and her son have been "victimized" and "traumatized" by those with whom they have interacted.
>
> ***
>
> She has little psychological insight (although she firmly believes that she is extremely insightful) and is likely to be resistant to exploring the possibility of any deficits within herself. She feels unhappy about her family life and is resentful of her current situation; however, her responses also suggest that she currently has little motivation to change her behavior.
>
> ***

---

[7] Ms. Haviland explained that "routinely, he either vomited or had diarrhea or had both" after Mother's visits, and that when she talked with Mother about this, Mother's response was that "there was no correlation in her mind" between the food she fed Eric and his diarrhea and vomiting.

[I]t is highly unlikely that Ms. [Mother] will be able or willing to see that she failed to care for her son appropriately, or that she needs to alter her way of parenting him. Because she feels that 1) she knows what is best for Eric, 2) others have malevolent intentions and are trying to mistreat or abuse her, and 3) those in authority are responsible for her current troubles, it is exceedingly unlikely that she will see the value in following guidelines set forth for the appropriate care and education of her son. As a result, based on the results of this evaluation, it is my impression that it would not be safe to return Eric to her care at this time.

When asked if there was a class Mother could take to significantly alter her outlook on life so that she would be able to parent Eric appropriately, Dr. Wilson testified:

If [Mother] were willing to participate in long-term-focused treatment that would address her personality disorder and the other issues that she has, it is a possibility that she could get to a point where she would be able to parent more effectively. Unfortunately, her personality disorder pretty much precludes her from being willing to participate in that treatment.

The testimony of these witnesses clearly and convincingly supports a holding that conditions that led to Eric's removal persist and are not likely to be remedied at an early date.

With respect to the ground of persistence of conditions, this Court has observed that:

"Where ... efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child."

*In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (internal citations removed) (quoting *In re A.R.,* No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

In our consideration of this ground, we are cognizant of the specific conditions that led to Eric's removal and the substantial responsibilities that were placed on Mother. First and foremost is the fact that Eric is an autistic child with unique needs, which, as the record shows, were not being met in Mother's home. He was thirteen years old when he

came into DCS custody, and the testimony of the DCS employees, as well as those affiliated with Norris Academy, was consistent with that of Dr. Wilson: Mother failed to comprehend that her attempts to home school Eric and her manner of raising him was not appropriate care for him.  Dr. Wilson's testimony was clear that Mother's personality disorder and other issues precluded her from addressing these factors.  Succinctly put, the conditions which led to Eric's removal persisted from the time of his removal to the time of trial and, in light of Mother's condition, showed no prospect of improving.  The testimony cited by Mother in support of her argument relates to the lack of any physical threat to Eric in her home and establishes that she was protective of him; this testimony, however, does not relate to the conditions which led to his removal.[8]

The evidence of persistence of conditions is clear and convincing, and we affirm the court's holding as to this ground.

## 2. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment, as defined at Tennessee Code Annotated section 36-1-102(1)(A), is a ground for termination of parental rights; the latter statute defines "abandonment" as follows:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> ***
>
> (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home

---

[8] Moreover, the testimony relied upon by Mother does not preponderate against the court's findings relative to Mother's unwillingness to enroll Eric in school, her failure to learn how to help Eric develop appropriately, her failure to address her mental health needs, or her resistance to the assistance provided by the therapists and case workers involved in the case.

for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

With respect to this ground, the court held:

The Court also finds by clear and convincing evidence that the Department has proven the ground of abandonment for failure to provide a suitable home, that the Department has made reasonable and extraordinary efforts in this case through the case workers, through Norris Academy, through therapeutic visitation, through substantial transportation services and assistance, through obtaining a psychological evaluation, and everything else that the Department provided, which was never appreciated by the mother. The mother never indicated any kind of inclination to know and understand what it would take to have a suitable home for Eric or how to make changes that would help him thrive and help him grow and develop in the way and manner that staff at Norris Academy allows him to do. And so, for all of the reasons that the Court has summarized and the findings of fact that the Court has made which support this, that the Court finds this ground by clear and convincing proof.

By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(1) and 36-1-102(1)(A)(ii) have been met for abandonment for failure to provide a suitable home.

Mother does not challenge the reasonableness of DCS's efforts, and the record contains substantial proof that DCS staff made weekly visits, stayed in regular communication with Mother, arranged assessments, provided assistance to Mother in the form of transporting her to court, visitation, and places such as the grocery store, food bank, or Wal-Mart, in addition to attempting to help her find employment and apply for Social Security disability. The record clearly and convincingly supports the court's finding that the efforts of DCS in this case were "reasonable and extraordinary."

Mother argues in her brief that the evidence shows that her home was suitable at all times, that "Eric has not progressed significantly during his confinement at Norris Academy," and that the progress he has made at Norris "would have occurred even if he had remained in her home." We respectfully disagree with Mother's contentions. This

13

Court has observed that "a suitable home requires more than a physical space." *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). We have also noted that:

> A well-built, fully furnished home does not a "suitable home" make; neither is a home which may lack some comforts or conveniences unsuitable for that reason alone. The failure of Mother . . . to cooperate with DCS and to comply with the requirements of the various counseling services was directly related to the establishment and maintenance of a suitable home.

*In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009). The physical condition of Mother's home is not the issue; rather, the lack of suitability of the home stems from Mother's inability to provide for Eric's significant educational, emotional, and medical needs.

Much of the testimony set forth in our discussion of the persistence of conditions is also applicable to this ground, including that of Ms. Rudder, Ms. Goldstine, Ms. Haviland, and Ms. Gardner, as well as that of Dr. Wilson.

In addition to that cited previously, Ms. Gardner testified that when Eric initially came into DCS custody and had a medical screening, it became apparent that he "wasn't up to date on his immunizations" and "had never had dental care." Ms. Goldstine testified that that every visitation of Mother's was strained and argumentative, that the visits were unsuccessful, and that she spoke with DCS about the need to cease visitation because it was "not productive." She also testified that she wanted Mother "to take responsibility for the child being in custody, not being so argumentative, being able to accept information and act upon that." Ms. Goldstine testified that "[Mother] really thwarted [Eric's] progress [at Norris Academy] and seemed to  - -  she was very symbiotic with him and would do what she could to keep him on a lower developmental level."

Dr. Wilson testified that Mother reported to her that she had been diagnosed with obsessive compulsive disorder and generalized anxiety disorder; Dr. Wilson's examination confirmed those diagnoses.[9] Dr. Wilson also concluded that Mother suffered from paranoid personality disorder, which is "a pattern of distrust and suspiciousness such that other's motives are interpreted as malevolent." Of particular pertinence to this issue is the following excerpt from Dr. Wilson's report:

---

[9] In Dr. Wilson's Confidential Psychological Evaluation, which was attached as an exhibit to her deposition and admitted into evidence at trial, she stated that Mother "stated  . . . that she was recently diagnosed with Obsessive-Compulsive Disorder and Generalized Anxiety Disorder. She also stated, however that she 'read the Merck Manual' when she got home and has judged those two diagnoses to be inaccurate."

14

She has little psychological insight (although she firmly believes that she is extremely insightful) and is likely to be resistant to exploring the possibility of any deficits within herself. She feels unhappy about her family life and is resentful of her current situation; however, her responses also suggest that she currently has little motivation to change her behavior.

The testimony demonstrates Mother's inability to recognize how she hindered Eric's abilities to learn and develop, as well as her failure to address her mental health issues or to embrace the methods recommended by professional counselors for parenting and assisting Eric. While Mother argues that she should not be held to the same standard of services provided at Norris Academy, a standard that the record makes clear she was never asked to achieve, the proof in the record shows that Mother resisted every effort to help her improve the environment in which she was raising her son. Mother's defiance, which is clear from the testimony of the case workers and therapists who interacted with her, prevented her from making necessary changes to her behavior. The evidence cited by Mother relates primarily to the physical condition of her home; as noted earlier, the proper focus of our inquiry is Mother's ability to address Eric's needs for developmental support in her home. The evidence she cites does not preponderate against the court's findings and the record fully establishes, by clear and convincing evidence, that Mother abandoned Eric by failing to provide a suitable home within the meaning of the statute.

### 3. Mental Incompetence

Tennessee Code Annotated section 36-1-113(g)(8)(B) provides:

The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii) That termination of parental or guardian rights is in the best interest of the child;

On the basis of Dr. Wilson's opinion, the petition for termination alleged: that Mother was mentally incompetent to provide adequate care for Eric because she "has little psychological insight . . . and is likely to be resistant to exploring the possibility of any deficits within herself" and "has a strong tendency to disregard any new information that does not support what she already believes to be true"; that Mother experiences symptoms consistent with diagnosis of Obsessive Compulsive Disorder, Generalized Anxiety Disorder and Paranoid Personality Disorder," the symptoms of which "render

15

her unable to care for her son appropriately"; and that it was Dr. Wilson's "impression that it would not be safe to return Eric to her care at this time." In the order terminating Mother's rights, the court concluded:

> In regard to the third ground, the Court finds that the proof has established that ground by clear and convincing proof specifically referring to the testimony of Dr. Wilson and the substantial conclusions that she made in her testimony, which included the mother's inability and unwillingness to make any changes, to expect any changes, that the mother was not going to have the capability or the desire or the impetus to make any changes or to make life changes that would be beneficial for Eric or to recognize her need to do so. Also, the history of the case totally supports and verifies the findings of Dr. Wilson, and that is exactly what has transpired, this unwillingness to understand, inability to follow through with clear instructions or to indicate any kind of willingness whatsoever to follow through with instructions or express any remorse.

> By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(8) have been met[.]

Mother argues that this holding was error.

We have reviewed Dr. Wilson's testimony and note again that she testified that Mother self-reported diagnoses of obsessive compulsive disorder and generalized anxiety disorder, which Dr. Wilson's evaluation confirmed. Dr. Wilson also concluded that Mother suffered from paranoid personality disorder; Mother presented no proof to counter these diagnoses.[10] Dr. Wilson testified that "the way that [Mother] was raising her son was not appropriate" and that based on her psychological evaluation of Mother, "it is [her] impression that it would not be safe to return Eric to her at this time." Dr. Wilson defined "safe" as "emotionally, physically, mentally in his best interests." She testified that "from an emotional and physical [point of view] and . . . based on what [Mother] told me and what I know about Eric's diagnosis, [Mother] is apparently content to allow him to remain at a level where he is non-functional and entirely dependent on her, and that's not okay."

---

[10] As noted previously, Dr. Wilson testified that:

> If [Mother] were willing to participate in long-term-focused treatment that would address per personality disorder and the other issues that she has, it is a possibility that she could get to a point where she would be able to parent more effectively. Unfortunately, her personality disorder pretty much precludes her from being willing to participate in that treatment.

Moreover, while Mother takes issue with the testimony and conclusions of Dr. Wilson, she does not address the substantial testimony of the DCS case workers and therapists which, as found by the trial court, verifies Dr. Wilson's conclusions. In addition to the testimony of Dr. Wilson, the testimony of Ms. Rudder, Ms. Goldstine, Ms. Haviland, and Ms. Gardner, set forth previously in this opinion, makes clear that Mother had not progressed in addressing her mental health issues during the pendency of this case. As this Court noted in *In re M.E.W.* and the cases cited therein, "[a] parent's continued incapacity to provide fundamental care for a child, whether caused by mental illness, mental impairment, or some other cause constitutes sufficient ground for termination of parental rights." No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004).

After a careful review of the record, we conclude that the evidence clearly and convincingly supports the trial court's determination that Mother suffered from mental incompetence, as defined in Tennessee Code Annotated section 36-1-113(g)(8), as the record demonstrates that Mother was "incompetent to adequately provide for the further care and supervision" of Eric's significant special needs because her "mental condition is presently so impaired and is so likely to remain so that it is unlikely that [she] will be able to assume or resume the care of and responsibility for [Eric] in the near future." *See* Tenn. Code Ann. § 36-1-113(g)(8). Because the evidence showed that Mother's mental condition was so impaired that she was unable to assume responsibility to provide the care Eric needs, the trial court properly determined that this ground was established.

### C. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[11] The list of factors in the statute "is not exhaustive, and the statute

---

[11] The factors at Tenn. Code Ann. § 36-1-113(i) are:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with

17

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue, we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

In addressing the best interest determination, the trial court held:

> The Court also finds that the State has established by clear and convincing proof that is in the best interest of Eric for the mother's rights to be terminated. The Court has given a fairly substantial review of what has taken place and the capability Eric has shown of developing, of doing well—and all of that development and improvement has been shown post removal from the mother—and about all of the things that he is developing and has been able to develop. Wherever he ends up being placed and/or being placed in a home, that those services could and should be available basically in any location or within close surroundings. That, again, based

---

the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

upon the fact that the mother—the best interest of Eric is to have the termination because the mother has not shown any remorse, has not shown a capability of understanding what needs to be done, has not indicated any kind of true intent to pursue any education or to follow through with those type of services or indicate any kind of change in her attitude or desire from the time that was trying to seclude the child from any other participation with peer groups or an educational type of environment, and has shown herself totally incapable of providing an environment for him to thrive such as has been provided over the last couple of years through Norris Academy and other services that have been provided.

By clear and convincing evidence, and pursuant to Tenn. Code § 36-1-113(i), the Court finds that it is in the best interest of the child to terminate the rights [Mother].

The trial court did not identify specific statutory factors in holding that termination of Mother's rights was in Eric's best interest. As noted in the ruling, the court made a "fairly substantial review of what has taken place and the capability Eric has shown of developing, of doing well—and all of that development has been shown post removal from the mother—and about all of the things that he is developing and has been able to develop."

Mother asserts that the court made factual findings with respect to factors (1), (2), (4), (5), and (8), and argues that the evidence does not support those findings. Discussing factors (1) and (2) together, Mother focuses solely on Eric's educational needs and argues that she "knew absolutely what was best for Eric, she always took care of him, and she did educate him." The evidence, however, is contrary to Mother's argument. As has been thoroughly discussed previously in this opinion, the testimony and other evidence fully supports the finding that there has been no adjustment in circumstance, and that one is unlikely to be achieved, due to Mother's failure to accept responsibility for Eric's educational and medical neglect, as well as to address her own mental health issues.

With respect to factor (4), Mother states that "the court found through the testimony of Ms. Haviland that there did not seem to be any kind of connection[; h]owever, this single statement is contradicted by virtually every other witness and by testimony of Ms. Haviland herself." Mother does not cite to testimony that supports this assertion, and upon our review, we find none. To the contrary, Ms. Rudder testified that, during the visitations she supervised, she observed that "[t]here was not much interaction between [Mother and Eric], other than her putting the food out," and Ms. Haviland testified that, contrary to her observation that Father was able to establish a connection with Eric in a short amount of time, with respect to Mother she "never witnessed what I would refer to as a connection between them on [Eric's] part."

19

With respect to factor (5), Mother argues that the finding that "Mother has shown herself totally incapable of providing an environment for Eric to thrive such as has been provided over the last couple of years through Norris Academy" was unsupported, and Mother contends that "Eric's progress at Norris would have occurred even if he had remained in her home." Again, the evidence is contrary to Mother's argument. Witness after witness testified about Mother's resistance to instruction and her insistence on continuing to do the things she thought Eric needed (i.e., to be fed large volumes of food) rather than working to learn the methods that had proven beneficial to him at Norris Academy.

With respect to factor (8), Mother argues that she is not so mentally or emotionally impaired as to be unable to care for Eric's needs; she does not cite to any evidence in support of this argument. To the contrary, the testimony relating to mother's mental condition was clear and convincing that her failure to address her condition and the manner in which she interacted with Eric was detrimental to him and prevented his development. While she is able to meet certain of his physical needs, she is unable to grasp how her own mental incapacities have impeded his development.

In addition to the specific factors cited by Mother, testimony at trial related to factor (6). Ms. Haviland, Ms. Goldstine, and Ms. Phillips testified about interactions between Mother and Eric that they perceived as sexually inappropriate; Ms. Haviland testified that as a result of the last of these inappropriate interactions she observed, Mother's visitation at Norris Academy was stopped.

In considering Eric's best interest, we again recognize that he is a unique child whose developmental needs were not being met by Mother, largely due to her inability to grasp the limitations imposed on her by her mental condition and her resistance to DCS involvement in Eric's development. At oral argument, both counsel for DCS and the guardian *ad litem* acknowledged the necessity of terminating Mother's rights in order to secure the best possible future for Eric.[12] The record in this case clearly and convincingly establishes that termination of Mother's parental rights is in Eric's best interest.

---

[12] With respect to Eric's potential for adoption, Ms. Rudder testified:

> We have been searching for a foster home. . . . [I]t will be much easier to find an adoptive home. However, he is not in full guardianship. So, we . . . cannot present his case as an adoptive case because he's not right now able to be adopted.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the court terminating the parental rights of Mother is affirmed.

_____
RICHARD H. DINKINS, JUDGE